[No. A072286. First Dist., Div. Five. June 20, 1996.]

JOEL KLEIN et al., Plaintiffs and Appellants, v.
CHILDREN'S HOSPITAL MEDICAL CENTER OF NORTHERN
CALIFORNIA et al., Defendants and Respondents.

## Counsel

Steel, Clarence & Buckley, Thomas Steel and Kate Dyer for Plaintiffs and Appellants.

Craddick, Candland & Conti, Judy S. Craddick, Phillip J. Maddux, Jean L. Perry, Anderson, Galloway & Lucchese, G. Patrick Galloway and Karen A. Sparks for Defendants and Respondents.

## Opinion

**HANING, J.**—Plaintiffs and appellants Joel and Cynthia Klein appeal the dismissal of their action for negligent infliction of emotional distress (NIED) against defendants and respondents Children's Hospital Medical Center of Northern California (CHMC), Dr. Mouied Alashari and Dr. Roger A. Williams, after respondents' demurrers were sustained without leave to amend. We affirm.

### Background

■ Since this appeal is taken from a judgment of dismissal after demurrers to appellants' complaint were sustained without leave to amend, established principles of appellate review require that we must accept all material facts properly pleaded as true (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]), that appellants' ability to prove their allegations is not a factor for our consideration, and that appellants need only

plead facts showing they may be entitled to some form of relief (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]).

This action arises from the alleged misdiagnosis of appellants' daughter, Paula.[1] On March 2, 1994, six-year-old Paula was admitted to CHMC for diagnosis of possible cancer. On March 3, 1994, respondents negligently misdiagnosed Paula as suffering from Ewing's Sarcoma, "a deadly form of bone cancer with an extremely poor prognosis . . . ." At that time respondents knew or should have known that Paula did not have Ewing's Sarcoma.[2] Paula remained in respondents' care until May 1994 when she was transferred to University of California San Francisco Medical Center for treatment.

At some unspecified time after communicating the incorrect diagnosis to appellants, respondents "sought authorization for treatment decisions" from them. Appellants gave authorization for unnecessary treatment, accompanied Paula to her medical treatments, and were "made aware of [her] highly negative prognosis." As a result of respondents' negligence, appellants suffered severe emotional distress.

The trial court ruled that appellants could not state a cause of action for NIED, and on that ground sustained respondents' demurrers without leave to amend.

DISCUSSION

I

The right to recover damages for NIED is still evolving in California, manifested by differences of opinion among the Courts of Appeal (see, e.g., *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398 [27 Cal.Rptr.2d 894] and *Mercado* v. *Leong* (1996) 43 Cal.App.4th 317 [50 Cal.Rptr.2d 569]), causing our Supreme Court to continue to explain or revise its earlier decisions (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1074 [9 Cal.Rptr.2d 615, 831 P.2d 1197] (*Burgess*) [clarifying *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] (*Molien*)]; *Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 130 [24

---

[1]Paula has a separate claim for medical malpractice in the trial court which is not the subject of this appeal, nor is Paula a party to this appeal. However, appellants erroneously include Paula as an appellant in their notice of appeal.

[2]At the hearing on the demurrers the court indicated that Paula was in fact suffering from lymphoma, a treatable cancer. Such allegation was not included in the complaint.

Cal.Rptr.2d 587, 862 P.2d 148] *(Huggins)* [further clarification of *Molien*]; *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814] *(Thing)* [clarifying *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] *(Dillon)* and rejecting dicta in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1]]).

■ Negligent infliction of emotional distress is not an independent tort in California, but is regarded simply as the tort of negligence. *(Burgess, supra,* 2 Cal.4th at p. 1072; *Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 884 [2 Cal.Rptr.2d 79, 820 P.2d 181]; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278] *(Marlene F.).)* Whether plaintiffs can recover damages for NIED is dependent upon traditional tort analysis, and the elements of duty, breach of duty, causation and damages must exist to support the cause of action. *(Burgess, supra,* 2 Cal.4th at p. 1072; *Huggins, supra,* 6 Cal.4th at p. 129.)

■ NIED claims to date fall generally into three categories: "exposure" claims, "bystander" claims and "direct victim" claims.

"Exposure" cases are typified by *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795], wherein plaintiffs who have not suffered any physical injury claim emotional distress from fear of contracting a disease because of their exposure thereto due to the defendant's misconduct. In such cases plaintiffs cannot recover unless they demonstrate that it is more likely than not they will contract the disease.

"Bystander" claims involve emotional distress caused by witnessing an injury to another, as occurred in *Dillon* and *Thing*, and are limited to close family members. *(Thing, supra,* 48 Cal.3d at pp. 667-668.)

The "direct victim" label is a misnomer, since it literally describes all plaintiffs who have been injured from the breach of a duty owed them by another. The term originated with *Molien* which held that a hospital and a physician it employed owed a duty to the husband of a patient who had been misdiagnosed by the physician as having syphilis, and had been told to advise her husband so he could obtain testing and, if necessary, treatment. The *Molien* court reasoned that because the risk of harm to the husband was reasonably foreseeable and the physician's negligence was directed at both the husband and the wife, the husband was a "direct victim." *(Molien, supra,* 27 Cal.3d at pp. 922-923.) Subsequently, the Supreme Court clarified that " '[F]oreseeability . . . alone is not a useful "guideline" or a meaningful restriction on the scope of [an action for [NIED].]' [Citation.] [¶] . . . [A] cause of action to recover damages for negligently inflicted emotional

distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached. [Citations.] In fact, it is this later principle which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess, supra,* 2 Cal.4th at p. 1074.) In a still later case the court stated that the duty in *Molien* arose because the doctor directed his patient, the wife, to tell the plaintiff husband of the diagnosis, not because the doctor's misdiagnosis " 'necessarily involved [the husband] directly.' " (*Huggins, supra,* 6 Cal.4th at p. 130.)

■ In the instant case appellants are asserting claims as direct victims arising from the negligent misdiagnosis of their young child, as they were erroneously told their daughter was likely to die from a cancerous condition which in fact did not exist. As a result, they subjected her to a heroic course of treatment in the attempt to forestall her death, thereby causing her further injury as a result of the unnecessary treatment. It is clearly foreseeable that parents may suffer severe emotional distress under such circumstances. However, whether respondents' alleged negligence permits appellants to recover damages for their resulting emotional distress is dependent upon the traditional tort analysis of duty, breach of duty, causation and damages, in which foreseeability assumes a minor role. (*Burgess, supra,* 2 Cal.4th at pp. 1072-1074; *Huggins, supra,* 6 Cal.4th at pp. 129-130.)

■ The existence of a duty is a question of law, and that duty must be one that the defendant has assumed, has been imposed upon the defendant as a matter of law, or arises out of the defendant's preexisting relationship with the plaintiff. (*Huggins, supra,* 6 Cal.4th at pp. 129-130; *Marlene F., supra,* 48 Cal.3d at p. 590.)

■ Appellants contend that because the diagnosis was directed at them there was a preexisting relationship between them and respondents from which respondents' duty of care to them arose. Their position is supported by a number of Court of Appeal decisions involving medical malpractice, some of which they cite, but all of which predate the most recent Supreme Court decisions on the subject. (E.g., *Schwarz v. Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470] (*Schwarz*); *Accounts Adjustment Bureau v. Cooperman* (1984) 158 Cal.App.3d 844 [204 Cal.Rptr. 881] (*Cooperman*); *Newton v. Kaiser Foundation Hospitals* (1986) 184 Cal.App.3d 386 [228 Cal.Rptr. 890]; *Andalon v. Superior Court* (1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899].)

In *Marlene F., supra,* 48 Cal.3d 583 two mothers who were engaged in joint therapy with their sons for family emotional problems were permitted

to seek recovery for emotional distress from the therapist upon discovering his sexual molestation of their children. In *Burgess, supra,* 2 Cal.4th 1064 a mother was allowed to proceed with her NIED action against an obstetrician and a hospital when her child was injured due to oxygen deprivation during birth. In both cases the plaintiffs were regarded as patients, thus supporting a relationship that allowed them to recover damages for emotional distress resulting from injuries to their children.

In *Huggins* parents were denied NIED recovery against a pharmacy which caused injury to their child by negligently directing an overdose of the child's prescription medication. *Huggins* held the parents could not recover as direct victims because the pharmacy's duty of care ran only to their child. In so holding, *Huggins* distinguished *Burgess* and *Marlene F.,* emphasizing that the plaintiff mothers in the latter cases were direct victims entitled to NIED damages resulting from injury to their children only because they themselves were patients of the defendant medical providers. " '[T]he simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent.' " (*Huggins, supra,* 6 Cal.4th at p. 131, quoting *Schwarz, supra,* 226 Cal.App.3d at p. 168.)

However, as we previously noted, *Huggins* also reaffirmed *Molien,* stating that the duty arose in *Molien* because a physician who had misdiagnosed his patient as suffering from syphilis advised her to tell her husband of her condition. "[T]he [*Molien*] opinion should be read as basing the defendant doctor's direct-victim liability *only upon his assumption of a direct duty toward the husband.*" (*Huggins, supra,* 6 Cal.4th at p. 130, italics added.) The answer to the duty question in the instant case lies in the reconciliation of *Huggins*'s interpretation of *Molien* and its quotation from *Schwarz* that the mere existence of a contractual relationship between parents and medical care providers for medical care of children does not impose a duty on the health care providers to the parents.

 In its discussion of duty in direct victim cases, *Burgess* reiterated the well-known factors for consideration in determining the existence of a duty: The foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. (*Burgess, supra,* 2

Cal.4th at pp. 1079-1080; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) We follow the same analytical format.

### A. *Foreseeability and Certainty of Parents' Injury*

██ It is self-evident that the emotional bond between parent and child will cause parents to suffer emotional distress upon learning that their child is dying from an untreatable medical condition. (See, e.g., *Cooperman, supra*, 158 Cal.App.3d at p. 848; *Schwarz, supra*, 226 Cal.App.3d at p. 166.)

### B. *Closeness of Connection Between the Conduct and the Injury*

Any medical care for the child necessarily involves the parents. As parents, appellants are not only the contracting parties with respondents for their six-year-old daughter's medical care, they have a legal obligation to provide such care (Fam. Code, §§ 3900 & 3901), are the decisionmakers regarding alternative forms of treatment (*Schwarz, supra*, 226 Cal.App.3d at p. 166; *Aronson* v. *Superior Court* (1987) 191 Cal.App.3d 294, 300, fn. 4 [236 Cal.Rptr. 347]), and are subject to prosecution if they fail to provide necessary medical attention for their child (Pen. Code, §§ 270 & 273a; *Walker* v. *Superior Court* (1988) 47 Cal.3d 112 [253 Cal.Rptr. 1, 763 P.2d 852]; *People* v. *Rippberger* (1991) 231 Cal.App.3d 1667 [283 Cal.Rptr. 111]). Appellants' six-year-old child could not make decisions regarding her medical treatment; her parents had to make those choices on her behalf. A necessary condition precedent for appellants' decisions regarding their daughter's medical care was an accurate diagnosis of her condition. The misdiagnosis of their daughter's impending death is ". . . closely (even inextricably) related to any emotional distress incurred by [appellants] upon [their] realization of the [condition of their] child." (*Burgess, supra*, 2 Cal.4th at p. 1081.)

### C. *Moral Blame*

██ We reiterate the *Burgess* analysis: " '[T]he legal standard of care required by doctors is the standard of practice required by their own profession.' [Citation.] 'The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. [Citations.]' [Citation.] Thus, liability is not found, and the label of malpractice is not placed upon a physician's actions, unless 'some deviation by the [physician] from the standard of care that his peers consider appropriate in the situation under

review' is proven. [Citation.] Whether the negligent act is the result of a momentary lapse of concentration or gross disregard for the health of the patient, in order to prevail on a claim for medical malpractice, a plaintiff must convince the trier of fact that the physician's peers would consider his act to be blameworthy. Under such circumstances, we cannot conclude that this factor supports a public policy limitation of a physician's liability to his patient." (2 Cal.4th at p. 1081.)

## D. Prevention of Future Harm

As *Burgess* observed, "One of the purposes of tort law is to deter future harm." (2 Cal.4th at p. 1081.) In the area of medical diagnosis, the adverse consequences of an erroneous diagnosis can be substantial, and for that reason the law imposes a duty of care on the diagnostician to render an accurate diagnosis to the patient. (See, e.g., *Molien, supra*, 27 Cal.3d 916.) Whether that duty should be extended to parents of minor patients is a policy question in the consideration of the consequences of the imposition of liability.

## E. Consequences of the Imposition of Liability

The consequences of the imposition of liability encompass policy considerations which we conclude the Supreme Court has determined should not support liability here. We look again to *Huggins*, in which the court compared the duty of the negligent pharmacist in that case to other health care providers.

"There is no material distinction between the professional duties of pharmacists and the duties of other health care providers that allows the parent of a child patient for whom a prescription is negligently filled to recover from the pharmacist as a direct victim. . . . [¶] Nothing . . . imposes any legal responsibility upon pharmacists for the emotional well-being of the patient's parents, even if the pharmacist knows the patient is an infant and that the parents will be administering the medication. . . . [The California Code of Regulations] . . . , provide[s] that the pharmacist must provide oral consultation about the prescription drug to '[the] patient *or the patient's agent.*' [Citation.] The obvious purpose of providing for consultation with a patient's agent has nothing to do with the agent's personal welfare; the purpose is simply to assure that the pharmacist's advice is put to good use for the benefit of the patient even in situations in which the patient would be unable to understand the advice. [¶] . . . [¶] If a child is seriously injured by erroneous medical treatment caused by professional negligence, the parent is practically certain to suffer correspondingly serious emotional distress. But

even if it were deemed reasonably foreseeable to a pediatrician, or a pharmacist, that a parent's realization of unwitting participation in the child's injury would by itself be a source of significant emotional distress from guilt, anxiety, or otherwise, that foreseeability would not warrant our establishing a new right of recovery for intangible injury. [Citations.]" (*Huggins*, *supra*, 6 Cal.4th at pp. 132-133, original italics.)

We think *Huggins* can be reconciled with *Molien* because the communication to the plaintiff husband in *Molien* that his wife was suffering from syphilis and that he should be examined and, if necessary treated, conveyed to him the message that *his own* medical condition was in peril. In *Huggins*, as in the instant case, the parents' distress was caused not by apprehension of their own health, but by that of their child.

In conclusion, we interpret *Huggins* as insulating respondents from appellants' claims for NIED.

### DISPOSITION

The judgment is affirmed.

Peterson, P. J., and King, J., concurred.