[No. B116305. Second Dist., Div. Two. Nov. 16, 1998.]

APOLONIO AGUIRRE-ALVAREZ, as Personal Representative, etc., et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

## COUNSEL

Burton, Norris & Galanter and Donald G. Norris for Plaintiffs and Appellants.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Mark B. Connely and N. Denise Taylor for Defendant and Respondent.

## OPINION

**BOREN, P. J.**—Does a hospital treating a patient in constructive police custody who dies at the hospital from gunshot wounds inflicted by police owe a duty to the decedent's relatives to locate and notify them? We conclude that the hospital does not owe such a duty.

### FACTS

Appellants Manuel Aguirre and Rosa Alvarez are the parents of the deceased, 19-year-old Alfonso Aguirre-Alvarez (decedent). Appellant Apolonio Aguirre-Alvarez (Aguirre-Alvarez) is decedent's brother and the appointed personal representative of his brother's estate. Paramedics transported decedent on May 7, 1992, to University of California Los Angeles Medical Center (UCLA), where he was admitted for emergency trauma care. Decedent had suffered six gunshot wounds to his chest, abdomen, and upper left extremity.[1] The gunshots injured several internal organs, decedent's spinal column, and his blood vessels. One of the injuries was to his colon, probably resulting in fecal matter infecting the abdominal cavity.

Initially, UCLA listed decedent as "John Doe." Subsequently, in accordance with hospital policy regarding patients with gunshot wounds or who have been involved in criminal activity, the hospital listed decedent on its charts and records under the alias "Frederick Inman."

UCLA surgeons performed a number of exploratory and remedial procedures. Physicians treated decedent aggressively with antibiotics. It was undisputed that the first three surgeries were performed consistent with the standard of care and did not cause decedent's death. Because of the condition of decedent's wounds, his chest cavity could not be completely closed,

---

[1] Hospital records indicate that a Los Angeles Police Department (LAPD) officer shot decedent after decedent stole a car.

air leaks developed,[2] and defendants found it impossible to "plug all the holes between the chest and belly." On May 13, 1992, the treating physicians diagnosed intra-abdominal peritonitis and necrotizing fascitis of his anterior abdominal wall. Decedent was treated for these severe infections, but further complications developed. On May 18, 1992, decedent went into cardiac arrest, was resuscitated, but never again regained "baseline mental function." On May 20, 1992, septic shock caused renal failure. Decedent succumbed on May 25, 1992, as the result of overwhelming sepsis stemming from multiple gunshot wounds, according to the coroner's report. The coroner's report also states that decedent had suffered "in all likelihood, a minimum of three fatal [gunshot] wounds . . . ."

On May 13, 1992, UCLA Social Worker Sandra Creary-Jennings spoke with an LAPD detective about information that decedent had given to the nursing staff. According to the notes of Creary-Jennings, decedent gave his address as 21011 Rugby, Apartment V, Huntington Park, and his telephone number as 213-583-0363. Her notes also state: "Police department to contact patient's family since patient is in police custody." On that same date, Creary-Jennings telephoned the number decedent had provided and referred to decedent's true name (which police had provided). The person who answered stated that people kept calling that number and that they (the people answering the telephone) did not know anyone named Alvarez.[3]

On a separate occasion before decedent expired, Richard Orlandi, a medical doctor at UCLA, was instructed to try to notify decedent's family. Dr. Orlandi contacted the police officer who was managing the case. That officer provided him with telephone number 213-583-0363. Dr. Orlandi placed a telephone call to that number. The person who answered the call tersely denied knowing decedent.

At the time decedent was shot, he had been living with his brother, Aguirre-Alvarez, at 7101 Rugby, Apartment V, in Huntington Park. The telephone number for this residence was 213-584-0364.[4] Decedent's parents resided in Mexico. Aguirre-Alvarez began a search for decedent and on May 10, 1992, obtained from the sheriff's department a booking number for him.

---

[2]Appellants alleged that medical malpractice occurred when defendants negligently mispositioned a chest wall drainage tube.

[3]Appellants' complaint alleges that the LAPD instructed UCLA not to notify decedent's family.

[4]The paramedics' "Emergency Medical Services Report" names decedent as "Alfonzo Aguirre" and lists a telephone number of 213-584-0364. Decedent's address is stated as "UNK." In normal procedure, UCLA would receive a copy of this report upon delivery of the patient.

Aguirre-Alvarez visited the Los Angeles County jail, University of Southern California-County Medical Center, and the county morgue but was unable to locate his brother. At LAPD's East Los Angeles station, known as Hollenbeck Station, a desk officer informed Aguirre-Alvarez that his brother was hospitalized but the computer did not disclose where.

In July 1992, Aguirre-Alvarez received two letters addressed to 21011 Rugby, Apartment V. One letter was from a UCLA anesthesiologist and the other from the Los Angeles County Department of Children and Family Services. Aguirre-Alvarez went to UCLA and there learned that his brother had died. He also learned that decedent's remains had been cremated.[5] LAPD returned decedent's wallet to Aguirre-Alvarez. He found that it contained his home telephone number as well as telephone numbers for several relatives and friends.

The news of the decedent's death and the cremation of his remains devastated appellants.

There was no evidence of a preexisting consensual relationship between appellants and respondent or respondent's agents and/or employees.

Appellants filed a complaint against the Regents of the University of California (respondent), who operate UCLA Medical Center, and certain of respondent's medical doctors and staff (defendants). The complaint alleged three causes of action: wrongful death, medical negligence, and negligent infliction of emotional distress. The wrongful death and negligent medical care causes of action were based on a claim that UCLA failed to diagnose and properly treat "necrotizing fascitis syndrome." The emotional distress cause of action was based on a claim that UCLA negligently failed to make proper attempts to notify the decedent's family of his circumstances, thus preventing proper disposition of decedent's remains.

All defendants other than respondent were voluntarily dismissed without prejudice pursuant to a stipulation between appellants and respondent. The trial court granted respondent's motion for summary adjudication and found that the third cause of action for negligent infliction of emotional distress had no merit. That cause of action was dismissed. On the negligence causes of action (causes of action 1 and 2), a jury rendered a special verdict

---

[5] Although the record on appeal presents no evidence on this point, the parties seem to agree that, after decedent expired, the coroner took control of decedent's body for the autopsy, failed to locate appellants, and disposed of the body thereafter by cremation. In their reply brief, appellants state that the coroner made a reasonable but unsuccessful attempt to locate appellants.

finding that respondent was not negligent in rendering medical care and treatment to decedent. Judgment was therefore awarded in respondent's favor.

Appellants appeal only from the trial court's granting of summary adjudication. Appellants contend that the trial court should have denied respondent's motion for summary adjudication because: (1) UCLA breached its statutory duty to use due diligence to notify·the relatives of the deceased, (2) appellants stated a claim for negligent infliction of emotional distress under Restatement Second of Torts section 868, and (3) public policy requires that hospitals have a duty to notify families. We affirm.

DISCUSSION

We review de novo the trial court's granting summary adjudication with a finding that respondent had no duty to notify or contact appellants. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505 [285 Cal.Rptr. 385].)

Whether a defendant owes a duty of care is a question of law. A defendant may be liable in tort for negligently inflicting emotional distress on persons to whom the defendant owes a duty of care. That duty can have three alternative origins: (1) a duty imposed on the defendant by law, (2) a duty assumed by the defendant, or (3) a duty arising out of a preexisting relationship between plaintiff and defendant. (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1072-1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197]; *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588, 590 [257 Cal.Rptr. 98, 770 P.2d 278]; see also *Wooden* v. *Raveling* (1998) 61 Cal.App.4th 1035, 1039 [71 Cal.Rptr.2d 891].) Although appellants do not expressly so state, it is clear that they are claiming as "direct victims" of respondent's negligence. (See *Burgess* v. *Superior Court, supra,* 2 Cal.4th at p. 1071.)

I. *Statutory Duty.*

Appellants contend that UCLA, as a public institution, had a statutory duty to notify them, as the relatives of decedent, of decedent's demise. They base their contention on Health and Safety Code section 7200 and the case of *Davila* v. *County of Los Angeles* (1996) 50 Cal.App.4th 137 [57 Cal.Rptr.2d 651]. Under the circumstances of this case, section 7200 does not mandate that respondent had a duty of notification.

Health and Safety Code section 7200 provides: "Every head of a public institution, city or county undertaker, or State, county, or city officer having charge or control of remains to be interred at public expense, shall use due diligence to notify the relatives of the decedent. . . ." The problem appellants cannot overcome is that respondent did not have "charge or control of [the] remains to be interred."

It is clear from the context of the Health and Safety Code chapter in which section 7200 resides that these provisions deal with agencies that, for a variety of purposes, have custody of individuals at the time of death. The chapter provides for notices and reports to the "State department [of Health Services]."[6] For example, the medical histories of "inmate[s]" who die of natural causes in prison must be sent to that department. (Health & Saf. Code, § 7201.) The state department may retain unclaimed bodies for scientific or educational purposes. (Health & Saf. Code, §§ 7202-7207.) Thus, before the state department may make educational or scientific use of an unclaimed body, the public institution that has "charge or control of [the] remains" must diligently attempt to notify relatives of the deceased. (Health & Saf. Code, § 7200.)

In our case, the coroner, not UCLA, is the public institution that had charge and control of the remains. First, it is undisputed that decedent remained in constructive police custody while UCLA treated him. Second, the victim died as the result of gunshot wounds, violence, and criminal activity. Government Code section 27491 provides in part: "It shall be the duty of the coroner to inquire into and determine the circumstances, manner, and cause of all violent, sudden, or unusual deaths; . . . deaths due to . . . gunshot . . . ; death in whole or in part occasioned by criminal means; . . . [¶] In any case in which the coroner conducts an inquiry pursuant to this section, the coroner or a deputy shall personally sign the certificate of death."

Thus, the coroner had the duty to inquire into the "circumstances, manner, and cause" (Gov. Code, § 27491) of decedent's death and by necessity had charge of the remains to conduct the autopsy. Health and Safety Code section 7102 provides in pertinent part: "[I]n any case where a coroner is required by law to investigate the cause of death, the coroner is entitled to the custody of the remains of the person whose death is the subject of investigation until the conclusion of the autopsy or medical investigation by the coroner."

[6]See Health and Safety Code section 20.

Government Code section 27460 provides that where the coroner makes an inquest "and no other person takes charge of the body of the deceased, the [coroner] shall cause it to be interred decently." Therefore, unless the relatives or other responsible persons take charge of the body after a coroner's inquiry, the coroner has "charge" of the decedent's "remains to be interred." (Health & Saf. Code, § 7200.)[7]

Another statute makes it clear that it is the coroner, in such circumstances as presented here, who has the duty to locate the relatives of an unclaimed dead person. Government Code section 27471, subdivision (a), provides: "Whenever the coroner takes custody of a dead body pursuant to law, he or she shall make a reasonable attempt to locate the family. After a reasonable attempt, the coroner may embalm the body or authorize the embalming by a mortician for purposes of preserving the remains for evidence, to prevent microbial and contagious disease hazards, or for investigative functions."

Appellants' reliance on Health and Safety Code section 7104, subdivision (a), is also misplaced. That statute applies "[w]hen no provision is made by the decedent, or where the estate is insufficient to provide for interment and the duty of interment does not devolve upon any other person residing in the state or [when] such person can not after reasonable diligence be found within the state . . . ." (*Ibid.*) In such circumstances then ". . . the person who has custody of the remains may require the coroner of the county where the decedent resided at time of death to take possession of the remains and the coroner shall inter the remains in the manner provided for the interment of indigent dead." (*Ibid.*) This provision places custody with the coroner when the circumstances otherwise would not require coroner jurisdiction over the remains. Those were not the circumstances here where the coroner was required pursuant to Health and Safety Code section 7102 and Government Code section 27491 to take charge of the body. Section 7104 is thus not applicable here.

The case of *Davila* v. *County of Los Angeles, supra,* 50 Cal.App.4th 137, does not assist appellants either. That case simply holds, as we have discussed, that, pursuant to Government Code section 27471, subdivision (a), as well as Health and Safety Code sections 7104 and 7104.1, the coroner has "a mandatory duty to make a reasonable attempt to locate decedent's family." (*Davila, supra,* at p. 140.) We thus conclude that, under the circumstances

---

[7]We do not here reach the question of whether a hospital has a duty to notify when a person dies in the hospital under circumstances where the decedent's remains are unclaimed and neither the coroner nor any other public agency has any statutory obligation to take charge or control of the remains.

presented here, Health and Safety Code sections 7104 and 7200 did not obligate UCLA to notify decedent's relatives.

## II. *Duty Assumed by Respondent or Arising Out of a Special Relationship.*

Appellants also contend that UCLA had a duty to notify arising from common law, the Restatement Second of Torts section 868, or public policy. Appellants claim this duty was to notify appellants regarding both decedent's hospitalization and subsequently his death. Appellants assert that UCLA's failure to notify deprived the family of the ability to advocate different health care measures and interfered with the family's right to have decedent properly interred.

▉ . With respect to emotional distress, our Supreme Court observed that Restatement Second of Torts section 868, recognizes "that liability for interference with dead bodies runs to the family member having the right to dispose of the remains" but that section 868 has been modified so that it "no longer limits recovery to family members." (*Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 889 [2 Cal.Rptr.2d 79, 820 P.2d 181].) The Supreme Court recognized that nonbystander family members could recover damages for severe emotional distress when the damages resulted from a " 'breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a special relationship between the two.' " (*Id.* at p. 890, citing *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d 583, 590.)

In *Christensen* v. *Superior Court, supra,* 54 Cal.3d 868, 890-891, the Supreme Court found that the mortuary defendants had "assumed a duty to the close relatives of the decedents for whose benefit they were to provide funeral and/or related services. They thereby created a special relationship obligating them to perform those services in the dignified and respectful manner the bereaved expect of mortuary . . . operators. The existence of this duty distinguishes the negligence action pleaded here from those of the bystander-witnesses who were plaintiffs in *Thing* v. *LaChusa* [(1989)] 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], and *Dillon* v. *Legg* [(1968)] 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]." (Fns. omitted.)

▉ The circumstances of the instant matter contrast sharply with the situation presented in *Christensen.* UCLA had no contractual relationship with any of decedent's relatives. It had undertook no obligation whatsoever

to provide any interment services or any other benefits to the family; it provided only health care services to the mortally wounded decedent. No statute obligated UCLA to notify decedent's family. Moreover, the statutes required UCLA to present the remains to the coroner, as it did. UCLA had no special relationship with any of decedent's family members. Instead, its relationship was with decedent and the police within whose constructive custody decedent remained until his demise. UCLA thus owed no duty to appellants and, in not notifying the family of decedent's demise, did not interfere with appellants' right to have decedent properly interred.

Public policy does not require judicial imposition of a duty to notify appellants about decedent's death. The Legislature has enacted a legislative scheme that allocates the duty under various circumstances. Thus, if the decedent were merely a hospital patient whose death did not invoke Government Code section 27491, then Health and Safety Code section 7104, subdivision (a), would seem to apply. In that instance, a hospital as a "person who has custody of the remains" could "require the coroner" to inter the remains but only if the relatives or other responsible person "can not after reasonable diligence be found within the state . . . ." (Health & Saf. Code, § 7104, subd. (a).) That condition precedent would require the hospital to make some inquiry about the decedent's family. Since the Legislature has adequately allocated the duty of inquiry and notice as to various circumstances, public policy does not require that this court announce a different allocation in order to prevent future harm. (See *Christensen* v. *Superior Court, supra*, 54 Cal.3d 868, 885-886.)

Appellants also claim that UCLA had a duty toward them respecting its obligation to provide nonnegligent health care to decedent and that UCLA had a duty to notify them that decedent was in UCLA's hospital. Appellants here had no preexisting relationship with the health care providers. Thus, their situation is not comparable to the plaintiff mother in *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra*, 48 Cal.3d 583, whose son was molested by the psychotherapist to whom both the mother and the son went for therapy. UCLA's patient was decedent. UCLA was not providing treatment or any other services to appellants. Thus, UCLA's duty of care was to decedent alone, and public policy does not require that this duty be extended to decedent's parents or other relatives. (*Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 131-132 [24 Cal.Rptr.2d 587, 862 P.2d 148]; *Klein* v. *Children's Hospital Medical Center* (1996) 46 Cal.App.4th 889, 895-899 [54 Cal.Rptr.2d 34].)

In *Huggins* v. *Longs Drug Stores California, Inc., supra*, 6 Cal.4th 124, the defendant pharmacy negligently filled a prescription for the plaintiffs' two-month-old son. The pharmacy wrote directions for five times the dosage

ordered by the doctor. (*Id.* at p. 126.) The Supreme Court rejected the Court of Appeal's conclusion "that a pharmacist automatically assumes a duty of care toward a patient's closely related caregivers simply by filling a prescription with actual or constructive knowledge that the patient is an infant or is otherwise helpless. That conclusion comports neither with California case law nor with sound public policy." (*Id.* at p. 130.) The Supreme Court found that "the end and aim of the prescription dispensed by defendant was to provide medical treatment for plaintiffs' infant son. . . . He, not plaintiffs, was the only patient being served by the transaction." (*Id.* at p. 132.)

The Supreme Court also clarified that its limitation of duty did not apply merely to pharmacists among health care providers. The court stated: "There is no material distinction between the professional duties of pharmacists and the duties of other health care providers that allows the parent of a child patient for whom a prescription is negligently filled to recover from the pharmacist as a direct victim. . . . [¶] Nothing in [the] duties [of a pharmacist to consult with the patient or his/her agent] imposes any legal responsibility upon pharmacists for the emotional well-being of the patient's parents, even if the pharmacist knows the patient is an infant and that the parents will be administering the medication. . . . The obvious purpose of providing for consultation with a patient's agent has nothing to do with the agent's personal welfare; the purpose is simply to assure that the pharmacist's advice is put to good use for the benefit of the patient even in situations in which the patient would be unable to understand the advice." (*Huggins* v. *Longs Drug Stores California, Inc., supra,* 6 Cal.4th at p. 132.) Since decedent was not an infant, it is an even more doubtful proposition that ascribing to UCLA a duty to consult with decedent's next of kin would make UCLA any more legally responsible for the kin's emotional well-being than was the pharmacist in *Huggins.*

The applicability of the *Huggins* limitation of duty to the facts in the instant case is evident from the Supreme Court's conclusion in *Huggins*: "If a child is seriously injured by erroneous medical treatment caused by professional negligence, the parent is practically certain to suffer correspondingly serious emotional distress. But even if it were deemed reasonably foreseeable to a pediatrician, or a pharmacist, that a parent's realization of unwitting participation in the child's injury would by itself be a source of significant emotional distress from guilt, anxiety, or otherwise, that foreseeability would not warrant our establishing a new right of recovery for intangible injury. [Citations.] [¶] . . . [¶] Because plaintiffs were not the patients for whom defendant dispensed the prescribed medication, they cannot recover as direct victims of defendant's negligence." (*Huggins* v. *Longs Drug Stores California, Inc., supra,* 6 Cal.4th at p. 133.)

With the *Huggins* case as its foundation, the Court of Appeal in *Klein* v. *Children's Hospital Medical Center, supra,* 46 Cal.App.4th 889, addressed the liability question *Huggins* anticipated. In *Klein*, the physicians at the defendant hospital misdiagnosed the plaintiffs' child as having terminal cancer. The child in fact had a less serious and treatable condition. The Court of Appeal affirmed the trial court's sustaining of a demurrer to the plaintiffs' complaint for emotional distress. Agreeing that it was foreseeable that the hospital's negligence would cause the parents to suffer emotional distress upon learning that their child was expected to die (*id.* at p. 897), the court relied on *Huggins* to hold that public policy should preclude extension of the defendants' duty of care to the parents. (*Id.* at pp. 898-899.) The court in *Klein* "interpret[ed] *Huggins* as insulating respondents [the hospital and staff] from [the parents'] claims for [negligent infliction of emotional distress]." (*Id.* at p. 899.)

Moreover, in their statement of disputed factual issues, appellants offered no evidence of "a preexisting consensual relationship" between appellants and respondent. Also, the jury's finding that respondent was not negligent in caring for decedent eliminates any argument that appellants, had they been notified before decedent's demise, would have prevented negligent care. Finally, in their separate statement of disputed factual issues, appellants admitted that "[p]laintiff [*sic*] was also as good as dead following his arrest on May 18, 1992 [*sic*]." Respondent is therefore insulated from appellants' emotional distress claim. (*Klein* v. *Children's Hospital Medical Center, supra,* 46 Cal.App.4th at p. 899.)

Appellants' citation of *Mackey* v. *U.S.* (D.C. Cir. 1993) 8 F.3d 826 [303 App.D.C. 422] is also unavailing as that case is distinguishable on its facts.[8] That court found that the hospital defendants there had a duty immediately to apprise the plaintiff as next of kin about the demise of her aunt. The defendants had assumed this duty through adoption of a hospital policy and through interhospital agreement. The decedent there was not subject to the coroner's jurisdiction, as was the decedent in the instant case. Had the circumstances of the death in *Mackey* occurred in California, Health and Safety Code section 7104, subdivision (a), would have applied. In those circumstances the coroner would take custody of the body for interment only "[w]hen no provision is made by the decedent, or where the estate is insufficient to provide for interment and the duty of interment does not devolve upon any other person residing in the state or [when] such person can not after reasonable diligence be found within the state . . . ." (*Ibid.*)

---

[8]Appellants concede in their opening brief that the court in *Mackey* based liability on Restatement Second of Torts section 868, and not on a negligent infliction of emotional distress theory.

Thus, initially the hospital would have had custody or charge of the remains, but those are not the facts here.

Appellants set forth no argument in their opening brief that respondent, by its own actions, assumed the duty to notify appellants about decedent's hospitalization. Thus, appellants have waived this argument. (*Los Angeles Unified School Dist.* v. *State of California* (1991) 229 Cal.App.3d 552, 556-557, fn. 4 [280 Cal.Rptr. 237]; *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623, 641 [178 Cal.Rptr. 167].) In their reply brief they argue that by admitting decedent as a patient, UCLA assumed an implied contractual relationship with decedent that included an implied condition that UCLA would "try to contact his family." Aside from the fact that this theory was not presented in appellants' opening brief and has therefore been waived, it is doubtful that decedent had any contractual relationship as he was in constructive police custody, having been arrested. The contractual relationship would therefore be between respondent and the city or county.

We observe that even if UCLA had a duty to notify, either regarding decedent's hospitalization or his death, appellants failed to show that UCLA was not reasonably diligent. The initial chart named decedent as "John Doe." Subsequently, the UCLA nursing staff received an address and telephone number directly from decedent before he became comatose. UCLA Social Worker Sandra Creary-Jennings spoke with an LAPD detective about that information, and LAPD agreed to contact the patient's family. Though the telephone number Creary-Jennings recorded in her notes was two digits off from the correct number, the evidence does not show that Creary-Jennings made a recording error rather than that the critically injured decedent reported it incorrectly. Moreover, LAPD had custody of decedent's wallet which contained the residential telephone number as well as other numbers. That the paramedic report had recorded the correct number does not create a triable issue of fact as to lack of diligence since it was not shown that UCLA in fact received a copy.[9] In any event, Creary-Jennings and Dr. Orlandi each telephoned the number UCLA received from decedent. Nothing in the record indicates that they should have suspected that the number was incorrect. Moreover, UCLA was entitled to rely on LAPD's representation that it would contact decedent's family. The record on appeal does not indicate that such reliance was in any way not in good faith. Thus, appellants could not show that UCLA did not make a reasonable effort to notify decedent's relatives.

---

[9]That report did not contain decedent's complete name and indicated that his address was unknown ("UNK").

## DISPOSITION

The judgment is affirmed.

Nott, J., and Zebrowski, J., concurred.