[No. F016745. Fifth Dist. Feb. 8, 1994.]

JOE EVANS, Plaintiff and Appellant, v.
CITY OF BAKERSFIELD et al., Defendants and Appellants.

**COUNSEL**

Michael J. Webb for Plaintiff and Appellant.

Lawrence M. Lunardini, City Attorney, John D. Closs, Assistant City Attorney, Allen M. Shaw and Walter H. Porr, Deputy City Attorneys, for Defendants and Appellants.

## OPINION

**BUCKLEY, J.**—This case stems from the detention of plaintiff, Joe Evans, by defendants, City of Bakersfield (City) and Police Officer Joseph Bianco, which ultimately resulted in Evans's hospitalization for a broken neck. The City appeals from a verdict in favor of Evans for state tort causes of action and federal civil rights violations.

We will reverse, holding that a person subjected to an unlawful detention does not have the right to use reasonable force to resist such detention and that in giving the "*Coffey*"[1] instruction to the jury, the trial court committed reversible error.

### STATEMENT OF FACTS

Evans and Bianco are disparate in size (Evans is six feet, nine inches tall, two hundred seventy pounds, while Bianco is five feet, eight inches tall, one hundred eighty pounds), and their recollections of the events transpiring at 10 p.m., February 16, 1989, vary substantially.

It is necessary to recount both of the conflicting accounts given by Evans and Bianco. However, it is uncontroverted the encounter did occur while Bianco was on patrol in the City and that Bianco was previously familiar with Evans.

### *Evans's Testimony*

Evans testified that he had spent the earlier part of February 16, 1989, at Lowell Park shooting baskets with some friends. Later, Evans and others went to another friend's house for dinner. About 9:30 p.m., one of Evans's friends drove him to the Sea Gull Apartments south of Bakersfield High School. Evans decided to walk from there to a friend's house on 40th Street. On his way, Evans walked in a northerly direction across California Avenue and then along F Street through the Bakersfield High School campus. As Evans crossed the alley between Truxtun Avenue and 17th Street, he saw two City police cars parked at the corner of 17th and G Streets. Shortly thereafter, the police cars moved; one went east on 17th Street and the other went south on G Street. Evans continued to walk on the sidewalk and heard what he assumed was a police car turning the corner. A police car stopped at the corner of Truxtun and F and its lights were turned off. Evans continued

---

[1]*People* v. *Coffey* (1967) 67 Cal.2d 204 [60 Cal.Rptr. 457, 430 P.2d 15] (hereafter *Coffey*).

walking north to the corner of 17th and F. As he was about ready to step onto the north curb, the police car pulled to the northeast corner of 17th and F and stopped. The officer, later identified as Bianco, told Evans to stop; Evans complied.

Shortly thereafter, a second officer, Stephen Horst, arrived at the scene. Upon Horst's arrival, Evans put his hands behind his head with his fingers interlocked. Bianco placed one of his hands over Evans's hands and attempted to handcuff Evans. Somehow during the handcuffing procedure Evans landed on the ground with Bianco on top of him. While on the ground, Bianco pushed Evans's face into the sidewalk causing a laceration to his lip and a scratch to his ear. Thereafter, Officer Smith arrived on the scene. All three officers and Evans were then on the sidewalk at the corner of 17th and F. At some point, Bianco twisted Evans's neck; Evans heard a crack, a sharp ringing in his ears, and then it was quiet. His head was thereafter stuck toward his right shoulder. Evans did not complain to the officers at the time. He did not know how Bianco twisted his neck. Evans testified that he did not attempt to resist the officers at any time and that if he had intended to do so, it would not have been difficult because the officers were all rather small compared to Evans.

Evans was handcuffed, placed in a police car and driven to the hospital by Bianco. His head was "stuck" twisted to the right when he arrived at the hospital. In due course, Evans was X-rayed, after which a doctor told him that his neck was broken. Prior to his encounter with Bianco, Evans was feeling good and was having no neck problems. He had suffered no accidents resulting in injuries to his head or neck "in the last days or weeks" before the incident.

### Bianco's Testimony

According to Bianco, he was driving his patrol car north on F Street from the vicinity of Bakersfield High School when he observed Evans standing adjacent to a storeroom behind a closed restaurant. Bianco's glimpse of Evans was brief but it was sufficient to identify Evans.

Bianco then positioned the patrol car in a nearby alley to enable him to observe the restaurant. He did not see Evans and after a few minutes drove toward the cafe. When Bianco next saw Evans, he was walking briskly to the north. Bianco then drove north along F Street toward the point where Evans was walking.

Bianco approached Evans and commanded him to stop because, in Bianco's opinion, Evans was now a suspect. Evans reacted by cursing at Bianco

and continuing to walk. As he followed Evans and approached the corner of F and 17th Streets, Bianco called for assistance from other officers.

When Bianco first began communicating with Evans at the corner of 17th and F Streets, Bianco noticed a bulge in Evans's right coat pocket (later determined to be a turkey bone, which he kept as a "good luck piece"). Bianco got out of his patrol car and told Evans to place his hands behind his head. Evans complied.

Shortly thereafter, Officer Horst arrived at the scene. Bianco approached Evans from behind and placed his left hand on Evans's hands. Remembering he had seen a bulge in Evans's right coat pocket, Bianco started a patdown search. Evans then pulled his left hand free from Bianco's grip and began to move his hand downward. Bianco responded by kicking Evans's legs apart; both Bianco and Evans then fell to the sidewalk. Officer Smith then arrived at the scene. Bianco testified that he did not twist Evans's head and did not permit either of his arms to encircle Evans's neck.

Evans was taken to the Kern County Medical Center where he complained of a sore neck. After X-rays, he was diagnosed as having bone fractures of the lowest cervical vertebra and uppermost lumbar vertebra, C-7, T-1.

Referring to the cause of the fractures, Evans testified that Bianco "twisted the hell out of [his] head," but that Bianco did not strike him on the head with any object.

The jury found by general verdict in favor of Evans in the amount of $316,043.17 for costs and general damages and $2,713.97 for interest on the special damages. The jury could not agree with respect to punitive damages against Bianco and the court declared a mistrial as to that issue.

### DISCUSSION

1. *The Coffey Instruction*

Evans requested, and the court gave, over objection, the *Coffey* instruction: "Every person is permitted to use reasonable force to resist an unlawful detention or unlawful search as those terms are defined by these instructions."

The City argues that this jury instruction is a misinterpretation of *Coffey* and "is wrong as a matter of law," and that giving the instruction

improperly prevented the jury from deciding the question of whether Evans caused the incident by virtue of his alleged resistance in the form of a quick hand movement downward with his left hand after breaking his hand free from Bianco's grasp.

For reasons we shall explain below, we agree that the instruction, popularly known as the *"Coffey* instruction," does not reflect the holding of *Coffey* and indeed is a misinterpretation. Reaching such a conclusion, however, does not obviate the need for further discussion, as we still must determine whether a person is allowed to use reasonable force to resist an unlawful detention or unlawful search.

To understand the application (or nonapplication) of *Coffey* requires a careful review of the context in which the issue of resistance to detention was addressed in that case. In *Coffey*, police officers attempted to detain Coffey for questioning about an alleged hit and run. Coffey responded with gunfire but later denied that he intended to shoot the officers. At trial on charges of assault with intent to commit murder, Coffey's credibility was improperly impeached with a prior conviction based on an unconstitutional guilty plea. The Attorney General argued that this error was harmless because even if defendant's testimony were taken at face value, the elements of each of the crimes of which he was found guilty were established. The Attorney General argued the application of Penal Code section 834a,[2] which bars resistance by force or weapon to arrest even if the arrest is unlawful. The California Supreme Court rejected this contention on the ground that section 834a concerns itself with arrest, not with detention, and there was no evidence presented that an arrest was in progress prior to Coffey's resistance.

In a footnote, the court recognized that prior to the adoption of section 834a, an officer making an unlawful arrest could be resisted by reasonable force and that when the proposed legislation which became section 834a was in committee, it initially forbade resistance to a detention. The court commented that this language was deleted by the Legislature, indicating a legislative intent that section 834a only apply to arrests. (67 Cal.2d at p. 221, fns. 18 and 19.) In its discussion of this issue, the court stated: ". . . we note that the jury was not instructed as to section 834a, and we think that this fact precludes the Attorney General from having recourse to the section in order to show that the error here in question would be harmless. The question here is that of the effect of error upon a jury instructed as the jury herein was instructed—not the effect of such error upon a jury instructed as the People would now prefer that it had been instructed." (67 Cal.2d at p. 221.)

---

[2]Statutory references are to the Penal Code unless otherwise noted.

As the resolution of the "section 834a issue" was not critical to the resolution of *Coffey*, the court's pronouncements thereon are dicta and not binding upon the lower courts. However, it has often been stated that the dicta of our Supreme Court are highly persuasive. (See, e.g., *Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450, 460 [290 P.2d 617].) Therefore, we will accept as resolved that section 834a does not state, *impliedly* or otherwise, that one has no right to use force to resist a detention, lawful or unlawful. Equally clear, however, is that nowhere in *Coffey* is it stated that a person has the right to forcibly resist an unlawful detention.[3]

While it can be argued that the section 834a discussion in the *Coffey* opinion distinguishing arrest from detention implied a conclusion that one has the right to forcibly resist an unlawful detention,[4] we do not agree. Looking at *Coffey* in its proper context, we simply conclude, as our Supreme Court did, ". . . section 834a concerns itself with *arrest*, not with detention for questioning." (Italics original, *Coffey*, *supra*, 67 Cal.2d at p. 221.)

Having concluded that *Coffey* does not mandate the instruction of law as given in the instant case and does not compel this court to hold that one has a right to forcibly resist an unlawful detention, we must then examine the issue to determine if any other compelling authority warrants such a conclusion. In our search, we have discovered no United States or California Supreme Court authority[5] addressing the right of a person to forcibly resist an unlawful detention.[6]

---

[3]It is well settled there is no right to resist a lawful detention. (*People* v. *Lloyd* (1989) 216 Cal.App.3d 1425, 1429-1430 [265 Cal.Rptr. 422].)

[4]Indeed, in *People* v. *Jones* (1970) 8 Cal.App.3d 710, 717 [87 Cal.Rptr. 625], the Second District Court of Appeal squarely stated: "By reason of the rule of *Coffey*, an officer engaged in an unlawful detention for questioning may be resisted by means of reasonable force." As the court did not otherwise discuss the validity of its conclusion other than by citation of "the rule of *Coffey*," and as we have concluded that no such "rule of *Coffey*" exists, we disagree with *People* v. *Jones*.

[5]In *People* v. *Collins* (1970) 1 Cal.3d 658, 664 [83 Cal.Rptr. 179, 463 P.2d 403], the California Supreme Court stated: "By pushing the officer's hand away and objecting orally to the search, the defendant provided no basis for a reasonable belief that defendant was reaching for a weapon or that continuing the pat-down would increase any risks to the officer's safety. If merely posing an objection to a search were sufficient to provide justification for a more extensive intrusion upon defendant's personal security, 'the right to be free from unreasonable police intrusions would be vitiated by its mere assertion.' " While the court's language may imply a right to take the action indicated above, the court was only concerned with whether defendant's actions warranted a reasonable belief held by the officer that defendant was armed. The propriety of forcible resistance to an unlawful detention was not presented. Therefore, *Collins* is inapplicable.

[6]Even though this was a 42 United States Code section 1983 action with both federal and state causes of action, counsel stipulated that a general verdict form would be used rather than special verdicts for the state and the federal causes of action. Counsel also expressly

Arguing that case law has established the right to forcibly resist an unlawful detention, Evans cites the following passage from *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1218 [275 Cal.Rptr. 729, 800 P.2d 1159] wherein the court stated: "On the other hand, most American jurisdictions, including California, recognized a traditional privilege to resist *unlawful* police conduct with 'reasonable' force." He also cites *People* v. *Cedeno* (1963) 218 Cal.App.2d 213, 227 [32 Cal.Rptr. 246] as affirming the right to forcibly resist an officer's assertion of authority. Indeed, *Cedeno* did state, as part of its holding: "It is abundantly plain that defendant did not freely and voluntarily consent to the search of his apartment. His effort in pushing the door closed is a clear indication that he did not wish the officers to enter or to search his room. In the absence of a warrant or probable cause for such a search, defendant had a right to forcibly resist an officer's assertion of authority to enter his home or search it or his person." However, we are not persuaded by either citation of authority.

When viewed in its proper context, the quoted passage from *Gonzalez* was merely a historical overview of the law prior to enactment of section 834a in the context of a larger discussion of the changes wrought by its enactment. In its subsequent discussion, *Gonzalez* ratified the necessity (in section 834a) to eliminate the " 'anachronistic' " privilege of self-help and to remove disputes to the court. (*Gonzalez, supra*, 51 Cal.3d at p. 1219.) Although the broad term "unlawful police conduct" was used, we do not construe its use as indicating the survival of the right, if it ever existed, to forcibly resist unlawful detentions.

In *People* v. *Cedeno, supra*, 218 Cal.App.2d 213, 226-227, the court relied upon *People* v. *Haven* (1963) 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927] and *Castaneda* v. *Superior Court* (1963) 59 Cal.2d 439 [30 Cal.Rptr. 1, 380 P.2d 641] as authority for the premise that a right exists to forcibly resist an "officer's assertion of authority." In truth, neither *Haven* nor *Castaneda* even remotely implies that conclusion, as neither case involved the use of any force by the defendant or even discussed in the abstract the propriety of force. *Castaneda* merely discussed the efforts of defendant, who had been

stipulated that a finding against the City would be deemed a "finding for Federal Civil Rights violations . . . ." Therefore, we have reviewed this issue to determine if a separate federal common law supports the instruction given. If it does, then irrespective of our determination of state law, the instruction was properly given. While we will be citing to some federal case authority, we conclude we are not bound by federal common law as the so-called right to resist unlawful detention is not of constitutional dimension and the instant case involved resistance to detention by state officers. Accordingly, the law of the state where the arrest takes place controls. (*United States* v. *Di Re* (1948) 332 U.S. 581, 589 [92 L.Ed. 210, 217, 68 S.Ct. 222]; *People* v. *Mickelson* (1963) 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].)

arrested, to lead the officers away from his home. We disagree with *Cedeno*'s bold statement of law, which is bereft of any legally sufficient authority.

Evans next argues that because there was a right to forcibly resist an unlawful arrest prior to enactment of section 834a (*People* v. *Curtis* (1969) 70 Cal.2d 347, 351 [74 Cal.Rptr. 713, 450 P.2d 33]), and because section 834a only affected the right to forcibly resist an unlawful arrest, the conclusion is inescapable there remains the right to resist an unlawful detention.[7] This argument, however, makes a critical assumption—that there is no distinction between an arrest and a detention, insofar as concerns forcible resistance. We disagree, as it is this distinction which supports the determination that there is no right to forcibly resist an unlawful detention.

■ An arrest is defined in the Penal Code as "taking a person into custody, in a case and in the manner authorized by law." (§ 834.) It is made by "an actual restraint of the person, or by submission to the custody of an officer." (§ 835.) A detention, on the other hand, has been said to occur "if the suspect is not free to leave at will—if he is kept in the officer's presence by physical restraint, threat of force, or assertion of authority." (*In re Tony C.* (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 582 P.2d 957].)[8]

As is apparent from the definitions above and from common sense, an arrest is a greater infringement than a detention. In fact, a detention is subsumed by an arrest because an arrest cannot occur without an initial detention. However, the converse is not true; a detention may occur without an arrest. ■ As we shall explain, it is that subsumption which mandates our conclusion that if there is no right to resist the greater, there is no right to resist the lesser.

In the common law, or at least the law prior to passage of section 834a, the concept of lawful resistance to an unlawful arrest stemmed from a belief in the right of a person "about to be injured" to resist commission of a public offense (the unlawful arrest constituting false imprisonment). (*People* v. *Spinosa* (1953) 115 Cal.App.2d 659, 664 [252 P.2d 409].)

While false imprisonment (defined as "the unlawful violation of the personal liberty of another" (§ 236) can literally occur by detention, the

---

[7]Evans does not contend that the right to resist unlawful detention or arrest is of constitutional dimension. However, even if the point were argued, it would be unavailing. (*People* v. *Curtis, supra,* 70 Cal.2d 347, 353; *People* v. *Burns* (1961) 198 Cal.App.2d Supp. 839, 841 [18 Cal.Rptr. 921].)

[8]We recognize, as did the court in *In re Tony C., supra,* 21 Cal.3d at page 895, that actual or threatened physical restraint is characteristic of a full-blown arrest. Nevertheless, a valid distinction exists.

degree of intrusion or injury is markedly less than in an arrest. Other than suffering indignity and inconvenience, more serious injury is unlikely.

As interpreted by Evans and held by *People* v. *Jones, supra,* 8 Cal.App.3d at page 717, a person subjected to an unlawful detention would have the right to use physical force upon an officer who was not even physically restraining the detainee, so long as the force used was "reasonable." This position is not only indefensible but dangerous. Moreover, it confounds common sense, given the interpretation in *Curtis* that section 834a does not allow forcible resistance unless excessive force is employed by the officer in the making of an arrest, and given that an arrest is a greater invasion of one's personal liberty than a detention. (*People* v. *Curtis, supra,* 70 Cal.2d at p. 356.)

█ Rather, the legal effect of an unlawful arrest or detention is to merely remove the cloak of authority from the officer because the officer is not acting in the performance of his duties. As stated in *People* v. *Curtis, supra,* 70 Cal.2d at pages 355-356, "We confirm that a resisting defendant commits a public offense; but if the arrest is ultimately determined factually to be unlawful, the defendant can be validly convicted only of simple assault or battery."

However, execution of an unlawful arrest or detention does not give license to an individual to strike or assault the officer *unless* excessive force is used or threatened; excessive force in that event triggers the individual's right of self-defense. (*People* v. *Curtis, supra,* 70 Cal.2d at pp. 355-357.)

█ Scant justification exists for the employment of force to resist detentions.[9] Indeed, the rationale underlying the enactment of section 834a applies equally to a determination of whether the law countenances or even should countenance forcible resistance to detention.[10]

█ "While defendant's rights are no doubt violated when he is arrested and detained a matter of days or hours without probable cause, we conclude the state in removing the right to resist does not contribute to or effectuate this deprivation of liberty. . . . [S]elf-help as a practical remedy is anachronistic, whatever may have been its original justification or efficacy in an

---

[9]Footnote 11 from *Terry* v. *Ohio* (1968) 392 U.S. 1, 14 [20 L.Ed.2d 889, 901-902, 88 S.Ct. 1868], cited by Evans, which recognizes that field interrogations are " 'a major source of friction between the police and minority groups,' " does not imply that an efficacious way of ameliorating the problem is to allow forcible resistance to such field detentions should they be without reasonable suspicion.

[10]Our opinion neither discusses nor should affect the right of a person to *nonviolently* resist the unlawful action of police officers. (Cf. *In re Michael V.* (1974) 10 Cal.3d 676, 681 [111 Cal.Rptr. 681, 517 P.2d 1145].)

era when the common law doctrine permitting resistance evolved. (See, e.g., Note (1967) 7 Natural Resources J. 119.) Indeed, self-help not infrequently causes far graver consequences for both the officer and the suspect than does the *unlawful arrest itself. Accordingly, the state, in deleting the right to resist, has not actually altered or diminished the remedies available against the illegality of an arrest without probable cause; it has merely required a person to submit peacefully to the inevitable and to pursue his available remedies through the orderly judicial process." (*People* v. *Curtis, supra,* 70 Cal.2d at p. 353, fn. omitted.)

The cynic justifies forcible resistance by presupposing harassment by officers in the field (cf. Chevigny, *The Right to Resist an Unlawful Arrest* (1969) 78 Yale L.J. 1128), while the optimist may argue that we should view unlawful detentions simply as good faith errors in judgment. In truth, neither of these preconceptions dictates our conclusion.

We are most strongly persuaded by reality. As implicitly recognized by the Legislature in its enactment of section 834a, it is highly unlikely that in a day when police are armed with lethal weapons and scientific communication and detection devices, a defendant using reasonable force can effectively deter an arrest. (Cf. *People* v. *Curtis, supra,* 70 Cal.2d at p. 353.) Similarly, we conclude that in a detention the same likelihood prevails and that ". . . self-help as a practical remedy is anachronistic." (*Ibid.*)

While society has an interest in securing for its members the right to be free of unreasonable searches and seizures, society also has an interest in the orderly resolution of disputes between its citizens and the government. (*United States* v. *Ferrone* (3d Cir. 1971) 438 F.2d 381, 390.) Given such competing interests, we opt for the orderly resolution through the courts over what is essentially "street justice."

Our conclusion is dictated by a pragmatic realization that the rule allowing forcible resistance leads to riots and violence by fostering a belief on the part of the detained person that he is the sole judge of whether the detention is or is not proper. (Cf. *People* v. *Burns, supra,* 198 Cal.App.2d Supp. at p. 841.)

Finally, we are swayed by the commonsense realization that the propriety of a detention is often the subject of a vigorously contested "motion to suppress" presented in court long after the initial incident. If the ultimate determination of the lawfulness of the detention is a troublesome question for trained legal minds, should there be a rule of law allowing spur-of-the moment physical force triggered by the detainee's lay perception of the

detention's legal justification? The mere positing of the question provides the answer. No.

## 2. *Prejudicial Error*

■ Having determined there is no right to use force, reasonable or otherwise, to resist an unlawful detention and that the instruction thereon given the jury was erroneous, we now decide whether the error was prejudicial.

In pertinent part, Code of Civil Procedure section 475 provides: "No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

We view the harm resultant from the erroneous instruction as substantial. The instruction allowed the jury, once it determined the detention was unlawful, to overlook as irrelevant, any of Evans's actions or movement after his initial detention. It did not compel an examination of the precipitousness of his arm movement and whether that action set in motion the chain of events which followed. To that degree, the jury was misled.

If an instruction is likely to mislead the jury, the error is prejudicial. (*DeGeorge* v. *Crimmins* (1967) 254 Cal.App.2d 544, 547 [62 Cal.Rptr. 394], citing, inter alia, 2 Witkin, Cal. Procedure (1954) Trial, § 68, p. 1799.) Having been improperly instructed, the jury's focus was shifted from a determination of whether Bianco's action in pushing Evans to the ground was an appropriate response to Evans's arm movement from Bianco's grasp to a consideration simply of whether Bianco's action from detaining Evans to causing his broken neck was an uninterrupted and unprovoked display of excessive force.

Once the jury found an unlawful detention and that Bianco's action caused Evans's broken neck, the verdict was preordained as there could then be no justification for the use of *any* force by the officer.[11] Prejudice is apparent.

---

[11]Our decision renders moot discussion of other issues presented on appeal or cross-appeal.

## DISPOSITION

The judgment is reversed. Costs are awarded to appellant City.

Stone (W. A.), Acting P. J., and Ardaiz, J., concurred.