[No. A094155. First Dist., Div. Two. Jan. 31, 2002.]

KEN MOON, Plaintiff and Appellant, v.
GUARDIAN POSTACUTE SERVICES, INC., Defendant and Respondent.

## COUNSEL

Lanahan & Reilley, Daniel F. Crowley and Cheryl P. Martinsen for Plaintiff and Appellant.

Horvitz & Levy, Peter Abrahams, Wendy S. Albers; Bjork Lawrence, Robert K. Lawrence and Douglas E. Watts for Defendant and Respondent.

## OPINION

**LAMBDEN, J.**—Ken Moon (Ken) challenges the lower court's determination that he does not have a claim for the negligent infliction of emotional distress (NIED) after he observed Guardian Postacute Services, Inc. (Guardian) abuse his elderly mother-in-law. We agree with the lower court that he is not "closely related" (*Dillon v. Legg* (1968) 68 Cal.2d 728, 741 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] (*Dillon*); *Thing v. La Chusa* (1989) 48 Cal.3d 644, 655 [257 Cal.Rptr. 865, 771 P.2d 814] (*Thing*)) and, therefore, cannot recover under a bystander claim. In addition, we conclude that he cannot, as a matter of law, allege a claim for NIED under the theory that he was a direct victim.

### BACKGROUND

Ken married his wife, Eileen Moon (Eileen), in October 1969.[1] Eileen is the daughter of Frances McMahon (McMahon); McMahon was born on March 28, 1911. Since the date of the Moons' marriage, McMahon spent at least one month per year with the Moons in their home in Walnut Creek. Since 1979, McMahon had her own bedroom in the home. Between 1992 and 1993, she lived with the Moons for approximately four to five months.

---

[1]These facts are from the second amended complaint, which we presume are true for the purposes of this appeal.

On January 7, 1999, Guardian, a skilled nursing facility in Walnut Creek, admitted McMahon after she had undergone treatment at an acute care facility. Prior to moving to the assisted living facility, McMahon lived with the Moons "for a period of time."

McMahon remained at Guardian for about 12 months, until she died. While at Guardian, Ken observed that McMahon had become malnourished and dehydrated, had lost significant weight, had become immobile and bedridden, had contracted infection, and had become incontinent. On January 22, 1999, Ken and Eileen appeared at Guardian to visit McMahon and they saw her lying in bed with infected wounds and black and purple blisters on her feet.

John McMahon (John), as executor of McMahon's estate, and Ken and Eileen filed a complaint for nine causes of action against Guardian on January 7, 2000. The first eight causes of action were on behalf of John, and the ninth cause of action, which was for NIED, was on behalf of Ken and Eileen. Guardian filed a demurrer to the complaint.

With respect to Ken's NIED claim, the court sustained the demurrer with leave to amend. The court ruled that Ken "has failed to allege any 'exceptional circumstances' which would entitle him to pursue this cause of action. (See *Thing*[, *supra,* 48 Cal.3d at p. 668].)"

John, Ken, and Eileen filed a first amended complaint on April 17, 2000. Guardian filed a demurrer to Ken's NIED claim. The court sustained the demurrer with leave to amend, ruling that absent undefined exceptional circumstances under *Thing, supra,* 48 Cal.3d at pages 667-668, footnote 10, NIED "is restricted to blood relatives and does not extend to in-laws residing with the accident victim."

A second amended complaint was filed; Guardian again demurred to Ken's claim for NIED. The court sustained the demurrer without leave to amend, finding that Ken "has yet to allege the 'exceptional circumstances,' required by *Thing*[, *supra,* 48 Cal.3d at pages 667-668], footnote 10."

The court entered judgment dismissing Ken's action, and Ken filed a timely notice of appeal.

DISCUSSION

I. *Standard of Review*

 The trial court sustained without leave to amend Guardian's demurrer to Ken's claim of NIED. When considering an appeal from a demurrer,

we accept the facts pleaded as true. (*American Philatelic Soc. v. Claibourne* (1935) 3 Cal.2d 689, 699 [46 P.2d 135].) The trial court erred if the pleading states a cause of action under any possible legal theory; it abused its discretion if the face of the pleadings shows a reasonable probability the defects could be cured by a properly amended pleading. (*Services by Medallion, Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1812 [52 Cal.Rptr.2d 650]; *Gami v. Mullikin Medical Center* (1993) 18 Cal.App.4th 870, 877 [22 Cal.Rptr.2d 819].) ▮ We conclude that the trial court neither erred nor abused its discretion.

## II. *NIED*

▮ NIED is a tort in negligence, and the plaintiff must establish the elements of duty, breach of duty, causation, and damages. " 'The distinction between the "bystander" and the "direct victim" cases is found in the source of the duty owed by the defendant to the plaintiff.' [Citation.] 'Bystander' claims are typically based on breach of a duty owed to the public in general [citation], whereas a right to recover for emotional distress as a 'direct victim' arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff [citations]." (*Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129-130 [24 Cal.Rptr.2d 587, 862 P.2d 148] (*Huggins*).) Ken contends that he sufficiently alleged both bystander and direct victim claims for NIED.

### A. *Bystander Claim*

▮ Ken contends that he sufficiently alleged a bystander claim because he pled that he had a close relationship to McMahon as her son-in-law and he observed the injury to McMahon. Guardian claims that a son-in-law, as a matter of law, is not closely related and therefore cannot claim NIED.

▮ The court first recognized the right to recover damages based on a bystander observing another person being injured in *Dillon, supra,* 68 Cal.2d 728. The court explained that the following factors need to be considered to assess foreseeability: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.* at pp. 740-741.)

 The Supreme Court in *Thing, supra,* 48 Cal.3d at page 656, noted that the inconsistent cases following *Dillon* created uncertainty as to whom may be considered "closely related" for the purposes of an NIED claim. The court noted that "foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the NIED action." (*Thing, supra,* at p. 663.) The court reviewed its decisions in loss of consortium claims, and concluded that a similar limitation in recovery was warranted for NIED claims. (*Id.* at pp. 665-666.) The court acknowledged that limiting recovery to certain persons would result in arbitrary lines (*id.* at p. 666), but it pointed out that there is a class of plaintiffs who, because of their relationship to the injured party, will usually suffer the greatest emotional distress (*id.* at p. 667).

The Supreme Court in *Thing* reiterated the three criteria set forth in *Dillon* as being necessary to recover damages. (*Thing, supra,* 48 Cal.3d at pp. 667-668.) In a footnote, the court explained in dicta the following with regard to the requirement that the plaintiff must be closely related to the injured victim: "In most cases no justification exists for permitting recovery for NIED by persons who are only distantly related to the injury victim. Absent exceptional circumstances, recovery should be limited to relatives residing in the same household, or parents, siblings, children, and grandparents of the victim." (*Id.* at p. 668, fn. 10.)

Ken asserts that the court in *Thing* did not require a relative to be a "blood" relative, and therefore Ken, who was closely related and residing with McMahon just prior to her admittance into Guardian, satisfies the criteria set forth in *Thing*. The court, according to Ken, could have restricted the requirement to "blood" relative if it wished. Indeed, elsewhere the court in *Thing* stated that recovery should be limited to "persons closely related by blood or marriage since, in common experience, it is more likely that they will suffer a greater degree of emotional distress than a disinterested witness to negligently caused pain and suffering or death." (*Thing, supra,* 48 Cal.3d at p. 666.) This statement, according to Ken, indicates that the relative does not have to be a "blood" relative but may be related by marriage.

Ken maintains that a son-in-law clearly falls within the definition of relative. Black's Law Dictionary defines relative as, "A person connected with another by blood or affinity; a kinsman." (Black's Law Dict. (7th ed. 1999) p. 1291, col. 2.) Affinity is defined as: "1. A close agreement. 2. The relation that one spouse has to the blood relatives of the other spouse; relationship by marriage. 3. Any familial relation resulting from a marriage." (*Id.* at p. 59, col. 1.)

We agree that the definition of "relative" obviously includes son-in-law. It also includes cousins, brothers-in-law, and numerous other—distant— relationships. No court has suggested that all relatives are sufficiently close to maintain an action for NIED. Indeed, a case prior to *Thing* refused recovery for a bystander claim on behalf of a cousin even when it was alleged that the cousins had a relationship analogous to that of siblings. (*Trapp v. Schuyler Construction* (1983) 149 Cal.App.3d 1140, 1142-1143 [197 Cal.Rptr. 411].) Although both parties did not cite this case, our court has permitted an uncle, who lived in the same household as his nephew and had a relationship akin to that of a parent and child, to sue for NIED when he observed his nephew being injured. (*Kriventsov v. San Rafael Taxicabs, Inc.* (1986) 186 Cal.App.3d 1445, 1447 [229 Cal.Rptr. 768].) This case, however, has limited value; the court determined that the uncle and nephew were closely related based primarily on a foreseeability analysis. (*Id.* at pp. 1449-1450.) As discussed *ante,* the Supreme Court in *Thing* rejected the notion that a pure foreseeability analysis should apply to NIED actions. (*Thing, supra,* 48 Cal.3d at pp. 667-668, & fn. 11.) Furthermore, the uncle was a member of the nephew's household at the time that he observed the nephew being injured. This is not the case here: McMahon was residing in the care facility at the time of her injury.

It is true, as Ken and the dissent maintain, that the Supreme Court in *Thing* did not restrict recovery for a bystander claim to "blood" relatives. However, the reason for this is obvious; spouses are not blood relatives but satisfy the requirement for a close relationship. Additionally, stepchildren, stepparents, and adopted children who are part of the familial relationship may not be related by blood to the family member making an NIED claim but may still be considered closely related.

We agree with the lower court and Guardian that by using the words "closely related" and highlighting the need to cut off liability beyond a certain point, absent exceptional circumstances, the court intended to limit NIED claims to members of the immediate family unit, *such as* parents, spouses, siblings, children, and grandparents of the victim. (See *Thing, supra,* 48 Cal.3d at p. 667-668, & fn. 10.) Indeed, the Supreme Court in *Elden v. Sheldon* (1988) 46 Cal.3d 267, 276-277 [250 Cal.Rptr. 254, 758 P.2d 582], stated that some courts had not limited the recovery of damages for NIED to the immediate family of the injured person, but it declined to follow the rationale of those decisions "for to do so would result in the unreasonable extension of the scope of liability of a negligent actor."

There is a presumption that members of the immediate family have emotional attachments. The Supreme Court has already explained that it

would place too great a burden on the court to determine whether unmarried cohabiting couples have an emotional attachment similar to those in a familial relationship (*Elden v. Sheldon, supra,* 46 Cal.3d at p. 275). It would be even a greater burden on the courts to have to consider whether in-laws have emotional attachments akin to parents/children or siblings.

Ken and the dissent rely heavily on the footnote in *Thing.* Admittedly, the footnote did little to help devise a bright-line rule regarding who is a close relative for the purposes of an NIED claim. The footnote limits recovery ". . . to relatives residing in the same household, or parents, siblings, children, and grandparents of the victim." (*Thing, supra,* 48 Cal.3d at p. 668, fn. 10.) The dissent and Ken assert that, since McMahon lived for "a period of time" with his spouse and him before moving into the assisted living facility, this requirement is met. The footnote in *Thing* does not specify whether the injured person must have been residing in the same household (1) at the time of the injury or (2) for a minimum period of time. Further, it does not specify whether the person has to consider that household as his or her primary residence.[2] Moreover, the footnote in *Thing* does not make it clear whether this residency requirement merely helps to define relative or whether it provides an exception to the "closely related" requirement.

Even if we were to presume that the footnote created an exception to the "closely related" requirement, and we were to presume further that the person did not have to be residing in the household at the time of injury,[3] we do not believe that an allegation that the person lived in the household for a "period of time" is sufficient. We do not disagree with the dissent that families have various forms nowadays. We note that often family members now live a distance away from each other. Thus, a parent may visit all of his or her children for a "period of time." For example, consider a parent with seven adult children, who visits all of these children's households for a period of time. Under the dissent's interpretation of the footnote in *Thing*, all seven spouses of the children have a potential claim for NIED. Yet, our Supreme Court made it clear in *Thing* that it intended to restrict the number of plaintiffs who could recover under an NIED claim, not expand the universe of plaintiffs as the dissent wishes to do. We therefore believe, at a minimum, the pleading must allege that the person resided in the household

---

[2]We take judicial notice of the death certificate attached as an exhibit to the original complaint, which states that McMahon's "usual residence" was in Queens County, New York. However, contrary to Guardian's position, this exhibit is not dispositive of McMahon's residence.

[3]This presumption creates numerous problems. What if the mother-in-law had resided in the home of the son-in-law and then lived in an assisted care home for 10 years? Would the son-in-law still have an NIED claim? If not, how recently must the injured person have resided in the claimant's household?

for a substantial period of time.[4] We need not reach the question of what constitutes a substantial period of time, since we hold that "period of time" clearly does not satisfy this requirement.

The dissent also asserts that we should reverse because Ken pleaded "exceptional circumstances." Ken alleged that McMahon visited his wife and him; that McMahon stayed with his wife and him for four to five months; that McMahon stayed with his wife and him for a "period of time" before moving to an assisted living facility; that he took her weekly to the doctor when she stayed with his wife and him; and that he arranged for her to be admitted into Guardian. Indeed, the dissent quotes extensively from the second amended complaint and concludes that Ken has sufficiently pleaded exceptional circumstances because he alleged a loving and close relationship with his mother-in-law. We do not disagree that Ken and McMahon had a close and loving relationship. We do, however, disagree that such a relationship constitutes exceptional circumstances. None of the facts alleged in the second amended complaint evinces an act out of the ordinary for a son-in-law. Our Supreme Court has made it clear that courts are ill equipped to assess emotional attachments (*Elden v. Sheldon, supra,* 46 Cal.3d at p. 275) and that the courts must draw arbitrary lines (*Thing, supra,* 48 Cal.3d at p. 666); accordingly, we hold that merely pleading a strong emotional bond akin to a son and mother relationship does not satisfy the exceptional circumstances requirement.

The dissent asks, if Ken's pleading does not constitute exceptional circumstances, "what is?" (Conc. & dis. opn. of Ruvolo, J., *post,* at p. 1022.) The opinion in *Thing* provides little guidance other than to stress that the court intended to limit the class of NIED plaintiffs. Since tort liability is always predicated on concerns about public policy, we believe that an NIED claim based on exceptional circumstances would also have to be grounded on issues of public policy. Thus, for example, if denying the claim would relieve the defendant from facing any liability for an NIED claim because there is no close living relative who can make such a claim, the court should consider the exceptional circumstances exception. Here, however, Ken's wife, Eileen, has an NIED claim and Ken has not pleaded any exception raising public policy concerns. Accordingly, we agree with the lower court that Ken did not plead exceptional circumstances.

---

[4]The dissent also emphasizes that McMahon lived for a month each year with the Moons since 1969 and for four or five months with them between 1992 and 1993. Moreover, she had her own bedroom in the house since 1979. There is no allegation that McMahon ever gave up her own residence during this period. In addition, we do not agree that temporarily residing in a household, or visiting a household, is sufficient to satisfy a requirement that the relative resides in the household.

## B. *Direct Victim Claim*

Ken contends that his pleadings also alleged NIED based on a direct victim claim. In his complaint, he alleged that he assisted in the admission of McMahon to Guardian by signing the admission forms. Moreover, personnel at the care facility were to contact him regarding any problems, and they had assured him on multiple occasions that McMahon would be provided proper care. Presumably, he is arguing that the nexus of his relationship with Guardian created a legal duty to him.

Courts, however, have already held that when the "plaintiff is not the defendant's patient . . . '[c]ourts have not extended the . . . direct-victim cause of action to emotional distress which is derived solely from a reaction to another's injury' [citation]." (*Huggins, supra,* 6 Cal.4th at p. 131; see also *Klein v. Children's Hospital Medical Center* (1996) 46 Cal.App.4th 889, 899 [54 Cal.Rptr.2d 34] [parents of child misdiagnosed as having terminal cancer had no direct victim claim].) Similarly, here, Guardian maintains, Ken cannot demonstrate that Guardian breached a duty owed directly to him and he cannot establish that such a breach directly resulted in his suffering emotional distress. Rather, Ken's claim is based on emotional distress allegedly suffered from witnessing McMahon's injury.

The Supreme Court in *Huggins, supra,* 6 Cal.4th at page 130, pointed out that it first held there could be a direct victim claim for NIED in *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 922-923 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]. In *Molien,* the Supreme Court held that a doctor owed a duty of care directly to the husband when his wife, the patient of the doctor, was incorrectly told that she had syphilis and was told to apprise her husband of the condition so he could be tested and have any necessary treatment. (*Id.* at p. 923.) The *Huggins* court explained that the doctor had a duty to the husband, not simply because the misdiagnosis necessarily impacted the husband, but because the "doctor directed his patient, the wife, to advise the plaintiff husband of the diagnosis." (*Huggins, supra,* at p. 130.) These particular facts in *Molien* do not apply to Ken.

After limiting the holding in *Molien,* the Supreme Court in *Huggins* held that, in the case before it, the parents did not have a direct victim action against the pharmacy that had provided them with five times the prescribed dosage for medication that they gave to their infant child. (*Huggins, supra,* 6 Cal.4th at p. 133.) The court concluded that the pharmacy had a legal duty only to the child. (*Ibid.*)

Ken attempts to circumvent the holding in *Huggins* by claiming that his claim is distinguishable because he had a preexisting relationship with

Guardian and the breach involved elder abuse. His first assertion has already been considered and rejected by other courts. For example, in *Schwarz v. Regents of University of California* (1990) 226 Cal.App.3d 149, 161-163 [276 Cal.Rptr. 470], which was cited with approval by the Supreme Court (*Huggins, supra*, 6 Cal.4th at p. 131), the court rejected the father's claim as a direct victim against the psychotherapist who had treated his son. The therapist had aided the boy's mother in removing him to London. The father in *Schwarz* not only had hired the psychotherapist, but also had participated in counseling sessions with the therapist. (*Schwarz, supra*, at pp. 161-163.) Still, the *Schwarz* court explained that a contract with the parent to provide care to the child was not sufficient to impose on the caregiver a duty of care to the parent. (*Id.* at p. 168.) The father in *Schwarz* had a stronger preexisting relationship with the therapist than Ken had with Guardian. Accordingly, even if we presume that Ken had a contract with Guardian to provide care to McMahon, which is not at all clear from the alleged facts, this would not be sufficient to impose on Guardian a legal duty of care to him.

Ken's second argument is essentially that we should create an exception to *Huggins* based on public policy reasons. Because this case involves elderly abuse, he argues, we should impose a broader duty of care. He points out that the purpose of the Elder Abuse Act (Welf. & Inst. Code, § 15600) is ". . . essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect." (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33 [82 Cal.Rptr.2d 610, 971 P.2d 986].)

Ken's argument, however, is not persuasive. The Legislature has enacted the Elder Abuse Act to protect the elderly and it already provides a remedy against negligent care facilities. The Legislature did not create a special class of people—like Ken—who may have suffered emotional distress as a result of an elderly relative being abused. Consequently, this act cannot be used to justify expanding NIED claims to any member of an extended family who has a relative residing in a care facility. The potential number of plaintiffs could be staggering. Permitting Ken to sue when he was not a patient or resident of Guardian would serve no purpose, and would contravene case law and the public policy of limiting liability for NIED claims.

### III. *Amending the Complaint*

Ken does not argue that the court should have permitted him to amend his complaint, and therefore he has not met his burden of demonstrating that the trial court abused its discretion (see, e.g., *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737]). Moreover, the court

gave him ample opportunity to cure the defects by permitting him to amend his complaint twice.

DISPOSITION

We affirm the judgment. Guardian is awarded costs on appeal.

Haerle, Acting P. J., concurred.

**RUVOLO, J.,** Concurring and Dissenting.—

I.

I concur with the conclusion of the majority opinion that Ken Moon (Moon) has failed to allege sufficient facts to state a cause of action under the "direct victim" variant of a claim for negligent infliction of emotional distress (NIED), as he has shown no violation of a duty owed directly to him. I respectfully dissent, however, from the portion of the opinion that also concludes he has failed to allege a cause of action for NIED under a theory of bystander liability.[1]

The issue is whether a son-in-law can state a cause of action for NIED for witnessing the alleged negligent treatment of his mother-in-law at respondent's nursing facility. Unquestionably, this issue of first impression is controlled by our Supreme Court's majority opinion in *Thing v. La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814] (*Thing*), in which the court revisited its landmark decision in *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] concerning bystander recovery for damages for emotional distress. In that case, the high court departed from a long-standing foreseeability analysis, and in its place, adopted a more procrustean "bright-line" test. This test limits the class of claimants who can sue for bystander NIED to those "closely related to the injury victim." (*Thing, supra,* 48 Cal.3d at pp. 667-668.)[2] However, further explanation of what constitutes a close relationship is interred in the opinion's footnote 10: "In most cases no justification exists for permitting

---

[1]Bystander liability is one form of a claim for negligent infliction of emotional distress. (*Wooden v. Raveling* (1998) 61 Cal.App.4th 1035, 1037 [71 Cal.Rptr.2d 891].) " 'Bystander' cases are cases in which the plaintiff was not physically impacted or injured, but instead witnessed someone else being injured due to defendant's negligence. (See, e.g., 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 841 et seq., p. 197 et seq. . . .)" (*Ibid.*)

[2]The other two prongs of the test are not in issue in this case. They are whether the plaintiff: 1) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim, and 2) as a result suffers serious emotional distress. (*Thing, supra,* 48 Cal.3d at pp. 667-668.)

recovery for NIED by persons who are only distantly related to the injury victim. *Absent exceptional circumstances, recovery should be limited to relatives residing in the same household, or parents, siblings, children, and grandparents of the victim.*" (*Id.* at p. 668, fn. 10, italics added.)

For three separate reasons, I disagree with the majority in this case that appellant Moon, the apparently adoring son-in-law of the victim, Ms. Frances McMahon, has failed to plead a cause of action for NIED against respondent, the nursing home operator in whose care Ms. McMahon was entrusted. First, the Supreme Court did not exclude as claimants "closely related" family members who are related through marriage, such as in-laws and step relations. (*Thing, supra,* 48 Cal.3d at pp. 667-668.) A fair reading of the *Thing* opinion, coupled with the allegations of Moon's second amended complaint (SAC), indicates Moon potentially falls within this subclass of allowable claimants.

Second, Moon detailed in his complaint a son-in-law relationship with Ms. McMahon of "exceptional circumstances." (*Thing, supra,* 48 Cal.3d at p. 668, fn. 10.) Therefore, even if he did not allege sufficient facts to show he was "closely related" to Ms. McMahon, a relationship of this caliber, if proved, establishes "exceptional circumstances," bringing Moon within an alternate subclass of claimants described by our Supreme Court. (*Ibid.*)

Last, Ms. McMahon resided in the Moon home, albeit for an undefined period of time, just prior to her transfer to respondent's nursing home. Thus, Moon potentially qualifies as a relative with whom the victim resided, and as such has standing to assert his claim for NIED. The majority disagrees because Moon's complaint failed to allege that the period of residence was "for a substantial period of time." (Maj. opn., *ante,* at p. 1013.) Even so, under the mandate of well-recognized precepts of appellate review, Moon should be allowed leave to amend his complaint to plead facts meeting this novel requirement.

For each and all of these reasons, I would reverse the dismissal, and allow Moon the opportunity to make his case for NIED in the trial court.

## II.

### A.

The original iteration of appellant's complaint was filed on January 7, 2000. This complaint was comprised of nine causes of action, eight of which related only to claims by the estate of Ms. McMahon. The ninth cause of

action alleged NIED by Ken and Eileen Moon, who are described, respectively, as Ms. McMahon's son-in-law and daughter. Respondent demurred to multiple causes of action, including the NIED claim. On April 6, 2000, the trial court sustained the demurrer to that claim, among others, with leave to amend on the grounds that plaintiffs had failed to allege they observed respondent's alleged negligent conduct. As to Mr. Moon, the court also stated: "Ken Moon has failed to allege any 'exceptional circumstances' which would entitle him to pursue this cause of action," citing *Thing.*

A first amended complaint for damages (FAC) was subsequently filed. As to Moon's NIED claim, in addition to alleging he was the son-in-law of Ms. McMahon, he averred the details of that relationship with some specificity in paragraph 2. Paragraph 51 was also amended to describe the observations leading to Moon's emotional distress, which were contemporaneous with respondent's negligence. Another demurrer challenged the FAC, and that demurrer to the ninth cause of action for NIED was sustained, again with leave to amend. Once again, the court alluded to the absence of "exceptional circumstances" and noted that under *Thing*, recovery was otherwise limited to "blood relatives."

The SAC followed in which NIED was pled once again as the ninth cause of action. This time, Moon was quite explicit in describing his relationship with Ms. McMahon:

"2. Plaintiff Ken Moon, is the son in law of the deceased, Frances McMahon. He was very closely related to the deceased in that he and his wife were the two family members who cared for and provided almost exclusively for her well being for a lengthy period of time up to the date of her death. During the last years of Mrs. McMahon's life, she lived with the Moon's [*sic*] on and off for months at a time. Ken Moon is a relative of Frances McMahon by his marriage with her daughter, Eileen Moon, and he did reside with her in the same household before she died. Ken Moon and Frances McMahon enjoyed a very close relationship as mother and son in law.

"3. The following exceptional circumstances exist with regard to Ken Moon's relationship with his mother-in-law, Frances McMahon. Since the date of Ken and Eileen Moon's marriage in October of 1969, Frances McMahon spent at least one month per year with Ken and Eileen Moon. Mrs. McMahon had her own bedroom in the Moon[s'] home in Walnut Creek since 1979. Between 1992 and 1993 Mrs. McMahon lived with the Moon[s] for approximately four to five months. During that time, she visited UCSF Medical Center for treatment every Friday morning. Ken Moon drove

his mother-in-law to those visits every week. Their relationship grew much closer over this period of time. Their weekly trips from Walnut Creek to San Francisco became a ritual. They developed a routine for taking extra time after Mrs. McMahon's treatment and visited sites and had lunch at the Buena Vista Restaurant. They even developed relationships with local vendors and the staff of their favorite lunch spots. They developed a habit of visiting vendors along Beach Street in San Francisco. They often times visited the Cliff House and enjoyed the nickelodeons. Ken Moon and Frances McMahon also enjoyed visiting Fisherman's Wharf during their weekly trips. Between 1993 and 1998 Mrs. McMahon continued to visit Mr. and Mrs. Moon with increased frequency until she moved permanently to California and lived with the Moons for a period of time before moving to an assisted living facility.

"4. Additional exceptional circumstances include Ken Moon's dealings with [respondent] and John Muir Medical Center. When Frances McMahon was admitted to [respondent's] facility, Ken Moon was the one individual with whom [respondent] had dealings. Ken Moon was responsible for signing the admission forms and providing Mrs. McMahon's medical history to the care providers. Mr. Moon was also listed as the Emergency Contact person on the admission forms. For all intent and purpose, the relationship Mr. Moon enjoyed with his mother in law was indistinguishable from the relationship she had with her other children and in many regards it was much closer."

The SAC was met by another demurrer, which again was sustained by the trial court on October 11, 2000, this time without leave to amend. The court reasoned: "Mr. Moon has yet to allege the exceptional circumstances required by [*Thing*]."

B.

Moon argued at every turn that he was owed a duty of care under *Thing* because he was "closely related" to Ms. McMahon through marriage, if not by blood. (*Thing, supra*, 48 Cal.3d at pp. 667-668.)

In *Thing*, the court said: "The narrow issue presented by the parties in this case is whether the Court of Appeal correctly held that a mother who did not witness an accident in which an automobile struck and injured her child may recover damages from the negligent driver for the emotional distress she suffered when she arrived at the accident scene." (*Thing, supra*, 48 Cal.3d at pp. 646-647.) The Supreme Court found that because the mother was not present at the scene of the accident in which her son was injured and she did

not observe the defendant's conduct and was not aware her son was being injured, she could not establish a right to recover for NIED. (*Id.* at p. 669.)

The issue before the Supreme Court, then, was a narrow one: Was it necessary for a plaintiff to have sensed the injury-producing event in order to assert an NIED claim? In addressing this issue, however, the Supreme Court undertook to "further define and circumscribe the circumstances in which the right to such recovery exists." (*Thing, supra,* 48 Cal.3d at p. 648.) One of the issues discussed was who could assert NIED bystander claims—the issue that must be examined in this case.[3]

The discussion in *Thing* relating to whom a duty of care was owed follows the court's analysis of the main issue under review—the requisite nexus between the injury and the plaintiff's awareness of it. In connection with this further question, the court stated: "Similar reasoning justifies limiting recovery to persons closely related *by blood or marriage,* since, in common experience, it is more likely that they will suffer a greater degree of emotional distress than a disinterested witness to negligently caused pain and suffering or death." (*Thing, supra,* 48 Cal.3d at p. 666, italics added.) This passage is then followed by footnote 10 in which the court explained: "Absent exceptional circumstances, recovery should be limited to relatives residing in the same household, or parents, siblings, children, and grandparents of the victim." (*Id.* at p. 668, fn. 10.) Therefore, when footnote 10 is viewed in light of the opinion's text, one is led to the inescapable conclusion that the majority's reference in footnote 10 to "parents, siblings, children, and grandparents" potentially includes those related by either blood *or* marriage to the victim.

Not only is this a reasonable conclusion from a fair reading of *Thing* as a whole, but also it is consistent with the policy concerns that drove the Supreme Court to limit the recovery of emotional distress to "closely related" persons. (*Thing, supra,* 48 Cal.3d at pp. 667-668.) That policy is reflected in the court's commentary on the reason the common law protects certain classes of persons who are likely to experience serious emotional injuries from the contemporaneous perception of an injury-producing event: "Unlike an award of damages for intentionally caused emotional distress which is punitive, the award for NIED simply reflects society's belief that a negligent actor bears some responsibility for the effect of his conduct on

---

[3]Because the plaintiff in *Thing* was the biological mother of the accident victim, there was no need to decide what other relationships might qualify for NIED recovery. Thus, that portion of the opinion is dicta of a sort ordinarily not binding on lower courts. (*Evans v. City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406].) However, it has been held that when the dicta emanates from our highest court, it should be considered "highly persuasive." (*Ibid.*)

persons other than those who suffer physical injury. In identifying those persons and the circumstances in which the defendant will be held to redress the injury, it is appropriate to restrict recovery to those persons who will suffer an emotional impact beyond the impact that can be anticipated whenever one learns that a relative is injured, or dies, or the emotion felt by a 'disinterested' witness. The class of potential plaintiffs should be limited to those who because of their relationship suffer the greatest emotional distress. When the right to recover is limited in this manner, the liability bears a reasonable relationship to the culpability of the negligent defendant." (*Id.* at p. 667.)

Despite this, in the present case the majority reads *Thing* as "limit[ing] NIED claims to members of the immediate family unit, such as parents, spouses, siblings, children, and grandparents of the victim." (Maj. opn., *ante*, at p. 1011, italics omitted.) This unduly restrictive reading excludes stepchildren, half brothers and sisters, and virtually all in-laws who will categorically be unable to sue for their serious emotional distress when witnessing the death or injury of a loved one. This restriction also ignores the much broader statement by the Supreme Court in *Thing* that "limiting recovery to persons closely related by blood *or marriage*" is justified "since, in common experience, it is more likely that they will suffer a greater degree of emotional distress than a disinterested witness . . . ." (*Thing, supra,* 48 Cal.3d at p. 666, italics added.)

Hopelessly confusing the issue, the majority declares in the paragraph preceding that quoted above: "Additionally, stepchildren, stepparents, and adopted children who are part of the familial relationship may not be related by blood to the family member making an NIED claim but may still be considered closely related." (Maj. opn., *ante,* at p. 1011.) Does the majority, then, mean to extend the class of NIED marriage-related plaintiffs to step relatives but not to in-law relatives? From what principle in *Thing* is the rationale for this apparent distinction derived?

At bottom, to read the Supreme Court's holding as barring either closely related step or in-law relatives from legal recourse evinces an indifference to the realities of modern family life as misguided and insensitive as were former cinematic and literary portrayals of mothers-in-law as insufferable, officious intermeddlers in family matters. Much closer to reality now is where close relatives, who are bound to one another through marriage, share their lives with one another intimately, making their relationship indistinguishable from biological relatives. In this country, where the divorce rate is

at 50 percent,[4] preventing stepparents, stepchildren, or in-law relatives from suing for NIED unjustifiably leaves an immense number of family members legally unprotected from torts that may exact a serious emotional toll on the bonds forged in second or subsequent marriages. Therefore, I would reverse, concluding that the common law, as interpreted by our Supreme Court in *Thing*, extends a duty of care to plaintiffs, such as Moon, whose close relationship is founded on marriage, not blood.

## C.

The sole ground mentioned by the trial court in its order sustaining respondent's demurrer without leave to amend was Moon's failure to allege "exceptional circumstances" justifying the extension of an NIED tort duty of care to him. (*Thing, supra,* 48 Cal.3d at p. 668, fn. 10.) But the terse conclusion of the trial judge came with no explanation of how the pleading was deficient: "Mr. Moon has yet to allege the exceptional circumstances required by [*Thing*]."

Earlier in this dissent I have set forth verbatim that portion of Moon's SAC in which he details his relationship with Ms. McMahon. In it, he describes a 30-year loving relationship between the two that equals or exceeds in intensity and affection those relationships many adult children have with their own aging biological parents. I will not repeat it but instead ask rhetorically, if Mr. Moon's relationship with his mother-in-law as described in his SAC is not "exceptional circumstances," what is? Certainly, counsel at oral argument were unable to articulate it. The majority here seems equally unwilling to do so. Ironically, while Moon surely earned the love of Ms. McMahon by his devotion to her over many years, the majority, without clarification, concludes he has no remedy for the emotional distress allegedly suffered as a result of respondent's negligent conduct because his relationship with her was not "exceptional." I disagree.

In this sense, this case is no different from *Quesada v. Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596 [261 Cal.Rptr. 769]. The sister and niece of a decedent whose remains were allegedly mishandled by the defendant mortuary brought that action. (*Id.* at p. 598.) The trial court sustained demurrers without leave to amend, and the question decided by the Fifth District was whether these relatives were precluded from suing for NIED as a matter of law. (*Id.* at p. 599.) After concluding the niece was not a "closely related" person under *Thing*, the court noted, however, that the niece's entitlement to sue could not be determined by "[t]he simple

---

[4]Time Almanac 2001 (Information Please) page 126.

expedient of calculation of the degree of consanguinity . . . ." (*Id.* at p. 610.) *Quesada* held the mortuary owed a duty of reasonable care to all close family members and refused to determine that a niece, as a matter of law, might not fall within the "extraordinary circumstances" category of non-household member in the *Thing* definition of close family relationship. (*Id.* at pp. 610-611.)

In light of the unusually high degree of specificity employed by Moon to plead exceptional circumstances, quite frankly I see little more he could add to his current pleading to improve it. The only hint offered by the majority as to how the "exceptional circumstances" prong might be satisfied is to suggest that courts might look at whether "denying the claim would relieve the defendant from facing any liability for an NIED claim because there is no close living relative who can make such a claim." (Maj. opn., *ante,* at p. 1013.) By this, the majority seems to proclaim that, hereafter, bystander NIED claims not brought by close blood relatives will be subject to a "one claim per family" rule. This is plainly not what the Supreme Court intended by "exceptional circumstances."

Because I am convinced that Moon has plead sufficient facts demonstrating "exceptional circumstances" justifying the extension of an NIED tort duty of care to him, I would reverse the trial court on this ground as well.

### D.

In addition to enumerated family members, the *Thing* decision also contemplates "relatives residing in the same household" as within the definition of persons "closely related to the accident victim" who have standing to sue for bystander NIED. (*Thing, supra,* 48 Cal.3d at p. 668, fn. 10.) Moon contends his complaint stated a cause of action for NIED by virtue of pleading facts meeting this alternative "residency" requirement. I agree.

As alleged in the SAC, Ms. McMahon commenced living periodically with Moon in 1969 when she began to spend at least one month annually with her daughter and son-in-law. So regular were these visits that Ms. McMahon had her own bedroom in the Moon residence beginning in 1979. In 1992 and 1993 she lived with the Moons for four or five months, and finally in 1998, she "moved permanently to California and lived with the Moons for a period of time before moving to [respondent's] assisted living facility." Apparently, that move took place in early January 1999, and Ms. McMahon remained at respondent's facility until July of that year.

The majority points out that, at best, Ms. McMahon resided with the Moons for a "period of time," and then only until the time of her admission

to respondent's facility. (Maj. opn., *ante*, at p. 1012.) After stating that it is not necessary to plead that the injured person was residing in the plaintiff's household *at the precise time* when the distress-producing injury occurred, the majority then articulates a new rule requiring that the period of residence, while not necessarily contemporaneous, must at least be "for a substantial period of time." (Maj. opn., *ante*, at p. 1013.) Therefore, because Moon did not have the prescience to anticipate the majority's holding, his pleading is inadequate for not so alleging, and his action subject to dismissal. (*Ibid.*)

This case was decided on demurrer. In evaluating a demurrer, "[t]hough a plaintiff may be unable to prove his allegations, he need only plead facts showing that he may be entitled to some relief. [Citation.]" (*Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789, 797 [198 Cal.Rptr. 208].) Sustaining a demurrer without leave to amend is a drastic measure, which ordinarily will constitute an abuse of discretion if there is any reasonable possibility that the defective complaint can be cured by amendment. (*Frommhagen v. Board of Supervisors* (1987) 197 Cal.App.3d 1292, 1304 [243 Cal.Rptr. 390].) If the complaint does not set forth sufficient facts to state a cause of action, but may possibly be cured by supplying omitted allegations, the plaintiff should be afforded the opportunity to amend the complaint. (*Ibid.*) The fact that the matter is on appeal from a dismissal following demurrer invokes a rigorous standard of review—the prism through which we view the issues presented to us. (See *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605, 611 [236 Cal.Rptr. 605].)

Therefore, even accepting the rationale adopted by the majority and the new legal requirement it imposes, customary rules of appellate review on demurrer demand that Moon at least be given leave to amend his complaint. This portion of the majority holding alone mandates reversal of the judgment.

## III.

The scope of the tort of NIED has been one of continuing controversy in California jurisprudence. Since 1989 when the Supreme Court decided *Thing*, that opinion has been examined or cited 99 times by intermediate appellate courts of this state faced with various issues relating to the tort's application. In the intervening 13 years, the Supreme Court has not clarified its views relating to bystander NIED; nor has it expounded upon the dicta that determines the outcome of this appeal. It also bears mentioning that

*Thing* was a four-to-three decision, and that none of the jurists in that case sit on the Supreme Court today.

Given these matters, and the ambiguity of footnote 10, I urge the Supreme Court to grant review of this case.